*IN ERROR.*

. . . . .

ALBANY,
April, 1814.

CLASON
v.
SHOTWELL.

* *April* 1, 1814.

</div>

<div align="center">

Judgment affirmed.

</div>

<div align="center">

ISAAC CLASON,   *Plaintiff in error,*

*against*

GILBERT SHOTWELL,   *Defendant in error.*

</div>

THIS cause came before this court on a writ of error from the supreme court. For the facts in the case, and the judgment of the court below, see vol. 10. p. 304.

The following was the form of the record and entry of judgment in the supreme court; in which the cause was thus entitled: " In the matter of *Gilbert Shotwell*."

After the *placita* in the usual form, the record proceeded as follows:

" *Westchester*, ss.

" Be it remembered, that, heretofore, to wit, in *May* term, in the year one thousand eight hundred and thirteen, to wit, on the sixth day of *May*, in the same year, before the justices of the people of the state of *New-York*, of the supreme court of judicature of the same people, at the city-hall of the city of *New-York*, came *Gilbert Shotwell*, by *William Slosson*, his attorney, and then and there, before the said justices,

<div align="right">

Every final or definitive sentence or decision of the supreme court, by which the merits of a cause are settled or determined, although such sentence is not, technically, a judgment, or the proceedings are not capable of being enrolled, so as to constitute what is, technically, called a record, is a judgment, within the meaning of the constitution of this state, and is subject to the appellate jurisdiction of the court of errors. *Aliter*, as to interlocutory

</div>

orders of the supreme court. Where, on an indictment for a *forcible entry* and *detainer*, no return could be obtained to a *certiorari*, by reason of the death of the justice, before the proceedings were had, the supreme court investigated the cause, on affidavits, and awarded a re-restitution, it was held, that the court of errors might, on writ of error, review the proceedings, on the evidence presented to the court below.

IN ERROR.
.....
ALBANY,
April, 18.14.
CLASON
v.
SHOTWELL.

prayed to be restored to the possession of a certain house and farm, with the appurtenances, situate in *Yonkers*, in the county of *Westchester*, from which he and *Samuel Briggs*, or one of them, were expelled, as he says, on the fifth day of *February*, now last past, and then and there, in support of his said prayer, did produce to the said court certain affidavits, which he prayed might be read by the said court, and the same were accordingly read by the said court, and the same are in the words and figures following, to wit :"

Then followed, *in hæc verba*, the affidavits produced on the part of *Shotwell*.

" And the said *Gilbert Shotwell*, by his said attorney, then and there prayed the said court, that upon the said affidavits so produced and read to the said court, he and *Samuel Briggs* might be restored to the possession of the dwelling-house and farm, with the appurtenances, situate in the town of *Yonkers*, in the said county of *Westchester*, and that a writ of restitution might be awarded accordingly. Whereupon the said court did, then and there, order, that *Isaac Clason*, *George De Peyster*, and *William A. Thompson*, show cause, before the said court, at the city of *New-York*, on *Friday*, the fourteenth day of *May*, then instant, at the opening of the court, or as soon thereafter as counsel could be heard, why the said *Gilbert Shotwell* and *Samuel Briggs*, or one of them, should not be restored to the possession of the said house and farm, according to the prayer of the said *Gilbert*, or for such other or further order and relief, as the court should then and there grant ; and that copies of the aforesaid affidavits be served on the said *Isaac Clason*, *George De Peyster*, and *William A. Thompson*, respectively ; at which day and place came the parties aforesaid, and the said *Isaac Clason* produced certain affidavits in opposition to the prayer of the said *Gilbert Shotwell*, which he prayed might be read by the said court ; and they are read and filed by the said court in the words and figures following, that is to say :"

Here followed the affidavits on the part of *Clason*, *in hæc verba*:

*IN ERROR.*
.....
ALBANY,
April, 1814.

CLASON
*v.*
SHOTWELL.

"And the said *Isaac Clason*, thereupon, prayed to be dismissed the court, without day, of and concerning the prayer of the said *Gilbert Shotwell*, and that the prayer of the said *Gilbert* might be denied, with costs, &c. But because the said justices are not yet advised what judgment to give of and concerning the premises, day is, therefore, given to the parties aforesaid, to appear before the said justices, at the capitol in the city of *Albany*, on the first *Monday* of *August* next, to hear their judgment of and concerning the premises, because the said justices are not yet advised, &c. at which day and place come the parties aforesaid, and all and singular the premises being seen, and by the court now here more fully understood, and mature deliberation being thereupon had ;

" It is considered that the said *Gilbert Shotwell* and *Samuel Briggs* be restored to the possession of the house and farm in *Yonkers*, in *Westchester* county, from which they, or one of them, were expelled, on the fifth day of *February*, one thousand eight hundred and thirteen, and that a writ of re-restitution be awarded accordingly."

A *preliminary* question was raised for the consideration of this court: to wit, whether a writ of error would lie in this case? But this question, by consent of the counsel of both parties, and with the advice of the court, was agreed to be argued at the same time with the points arising on the *merits* of the cause, as decided on by the supreme court.

The counsel for the plaintiff in error, stated the following points :

1. That the judgment of the supreme court, and the award of re-restitution, in this case, are proper to be reviewed in this court by writ of error.

2. The supreme court have no original jurisdiction, by affidavit alone, without writ or process :

3. Even if the want of a writ of *certiorari*, or other process, could be supplied by affidavit, yet there was no *judicial* proceeding before the justice, nor any award of restitution made by him.

4. Admitting that there was a judicial proceeding by the justice, yet the equivocal and temporary possession acquired by the defendant in error, was by force or fraud; and the supreme

IN ERROR.
·····
ALBANY,
April, 1814.

court ought, therefore, in the exercise of a sound legal discretion, to have refused to restore him again to that possession, against the lawful owner or possessor.

CLASON
v.
SHOTWELL.

*2 Caines' Rep. 179. 183. 3 Johns. Cases, 107.

† 1 N. R. L. 96. Fortesc. Rep. 173. ¶ 11 Mod. 236.

§ 1 Keble, 563. 572. 8 Johns. Rep. 44. 2 Burn's Just. 179, 180. 3 Ld. Raym. 360. 1 Lev. 113. 1 Sid 56. ‖ 2 Salk. 450. ** 1 Salk 263. 144 S. C. 3 Salk. 148.

†† Ld. Raym. 213. 254. 454.

J. V. N. Yates, for the plaintiff in error.   1. A writ of error lies in this case.  A certiorari is the subject of pleading.* The conviction before the justice is a record, and although the general and common mode of bringing the matter in review before the supreme court is by certiorari, yet a writ of error will lie.† In the case of The Queen v. Layton,‡ the words of the conviction were, "therefore it is considered," &c. and the decision of the court that the conviction be affirmed, shows that it was in the nature of a judgment.§   In King v. Chaloner,‖ the court of K. B. said the record of force might be quashed without a writ of error, if it was insufficient, plainly showing that a writ of error lies.  And so in the case of The Queen v. Layton, as reported in Salkeld,** the court say, if a fine be set, the conviction cannot be quashed on motion, but the defendant must bring a writ of error.

In Gronvelt v. Burnell,†† Holt, Ch. J. held that whenever a new jurisdiction is erected by act of parliament, and the court or judge that exercises this jurisdiction, acts as a court or judge of record, according to the course of the common law, a writ of error lies on their judgments ; but where they act in a summary method, or in a new course, different from the common law, then a writ of error does not lie, but a certiorari.  And in The Queen v. Layton, as it appears in 1 Salk. 106. and in The

‡‡ 1 Salk. 266.

§§ 3 Bl. Com. 396.

‖‖ 6 Johns. Rep. 402.

Queen v. Foxby, ‡‡ it was held that where the record of conviction was removed by certiorari, a writ of error lies coram vobis, &c. which was held to be the proper course ; though in the latter case, the Chief Justice said the court was well possessed of the cause by a writ of error on the conviction, without a certiorari.

"A judgment," says Blackstone,§§ "is the determination and sentence of the law.  It is the conclusion that naturally and regularly follows from the premises of law and fact ;" and it is expressed by the words, "therefore, it is considered by the court."  If the justice's proceeding and conviction was in the nature of a judgment, the decision of the supreme court is a judgment thereon.  Spencer, J. in the case of Yates,‖‖ gives a correct definition of a judgment or judicial proceeding, on which

a writ of error will lie. Whenever a decision takes place in the supreme court, which is final, and of which a record can be made, and which shall decide the rights of property or personal liberty, in such case the statute gives jurisdiction to this court. Coke* says a writ of error lies when a man is grieved by any error in the foundation, proceeding, judgment, or execution. But without a judgment, or award in the nature of a judgment, no writ of error lies; and in *Metcalf's Case*,† he states the *exceptions* to the general rule, that error does not lie, but on a judgment, &c. and which will comprehend the present case. So, a man may have a writ of error before all parts of the cause are decided, as on demurrer, before a writ of inquiry of damages is executed;‡ or in *quo warranto*, where judgment is given for part of the liberties claimed, and the court take time to consider as to the other part.§

In *Ascue* v. *Fulijambe*,‖ it was held that a writ of error would lie on an award of execution on the statute merchant, though no writ of error would lie on an erroneous acknowledgment of the statute, but an *audita querela*. So, a writ of error lies on a *fine and recovery*, though the word judgment, or any thing in the form of a judgment, is not to be found in the writ or proceedings.**

Where bail brought a writ of error, as well for error in rendering the judgment, as awarding the execution on the *scire facias*, though the writ of error was quashed as to the judgment against the principal, yet it was allowed to stand good as to the judgment against the bail on the *scire facias*.†† So, where a writ of error was brought as well for the rendering of judgment against the testator, as awarding execution against the executors,‡‡ it was held good as to the award of execution.

Whatever judgment the court below may have given on the proceedings certified by the justice, whether to quash, affirm, or reverse them, it is such a judgment that error will lie thereon.

If the supreme court had jurisdiction of the cause on the affidavits, then all the purposes which could have been effected by a *certiorari*, are as well effected by the affidavits. The court has the same view of the proceedings before the justice. Having elected to bring the matter before the supreme court by affidavit, the opposite party cannot thereby be deprived of his right to have the decision of that court reviewed. The supreme

IN ERROR.
.....
ALBANY,
April, 1814.
CLASON
v.
SHOTWELL.
* Co. Litt. 289.
b.

†11 Co. 38—41.

‡ 1 Roll. Abr.
751.    11 Co.
41.
§ Palmer, 1, 2.

‖ Cro. Eliz.233.

** 1 Roll. Abr.
747.    Ball v.
Cork,    Lilly's
Entries, 280. 1
Roll. Abr. 7781
789.

†† Burr v. At-
wood,   1   Ld.
Raym 328. S.C.
Carth. 447.

‡‡strange,1055.

IN ERROR.

ALBANY,
April, 1814.

CLASON
v
SHOTWELL.
* 2 Salk. 504.

court might have ordered a joinder in error, and considered the return, of which a *memorandum* was made by Mr. *Munro*, as a return to the writ.

The common law,* as well as the statute, (sess. 24. c. 25. 1. *N. R. L.* 143.) encourages writs of error, declaring them to be writs of right, and grantable *ex debito justitiæ*, and not as matter of grace or favour.

2. As to the merits ; first, we contend that the supreme court had no jurisdiction in the case, by mere affidavits alone, without writ or process.

The cases cited in the court below do not support the position that the court could proceed without writ. *King* v. *Cha-loner*,† came up on *habeas corpus*, and *The Queen* v. *Layton*,‡ on *certiorari*.

† 1 Sid. 156.
Lev. 113.
‡ 1 Salk. 106.
S. C. 2 Salk. 450.

No case can be found of the court of K. B. exercising its superintending power over inferior courts or jurisdictions, without writ or process. In *Rex* v. *Elwell*,§ where there was *no fine* set by the justice, the party was brought up on *habeas corpus*, and the return stated the cause of his commitment to be on a conviction of forcible entry and detainer ; and the court refused to consider the exceptions, until the conviction was regularly brought before them, by *certiorari*. This cause was decided long subsequent to the others, and settles the rule on the subject. As to the supposed *necessity* of proceeding on affidavits, in consequence of the *death* of the justice, it is enough to say that his death cannot alter the rule of law ; and there is a remedy for the case, for the *certiorari* might be directed to the executor or administrator of the justice.‖

§ 2 Str. 794.

‖ 1 Bac. Abr.
Certio.(C ) 563.
2 Hawk. P. C.
c. 27. s. 41. 1
Dyer, 163.
Dalton, 6. 134
** 3 Caines' Rep.
126
†† 7 Johns. Rep.
19,

‖‖ Hawkins, P.
C. b. 1. c. 54.
s. 63, 64.
§§ Sayer, 176.
Saville, 68. Cro.
Eliz. 31. Noy,
119. Yelv. 99.
Cro. Jac. 148.
‖‖ 1 Bac. Abr.
Cert (K.) 574.
2 Keb. 1142.

In *Ramsay* v. *Crary*,** where a justice left the state without making a return to a *certiorari*, the court did not think it a sufficient reason for substituting any thing else for the return of the justice. In *Brush* v. *Taggart*,†† the supreme court would not allow *parol* evidence to be given of the contents of a *certiorari*. The writ itself, or an office copy of it, must be produced, or satisfactory evidence must be given of its being lost. There was no evidence, in this case, of the loss of the writ. The language of *Hawkins*,‡‡ where he speaks of the proceedings being *removed*, shows that there must be a writ.§§ The supreme court ough. to have required a return to the *certiorari*, or have issued another writ.‖‖ The record made by the justice

on view, ought to be made a *judgment*, and certified into the superior court.*

3. The draught of a return to the *certiorari*, prepared for the justice, makes no mention of re-restitution; and, indeed, such a mode of preparing the returns of justices, is not sanctioned or approved by the supreme court.† Whatever the justice did, which is not contained in the record of his acts, is not to be considered as done *colore officii*. If the affidavits are attentively examined, nothing will be found to show that there had been *legally* a change of possession. *Parol* evidence is not admissible as to the contents of the writ of *certiorari*, the justice's return, or any of his proceedings, for his return is not traversable.‡

4. The supreme court ought not to award re-restitution, where the *right* of possession has not been established.§ And, even, if *Shotwell* had the possession, the court below ought not, under the circumstances of the case, to have awarded re-restitution. Though the plaintiff in error might have been indicted, and fined, for a breach of the peace, yet, having regained the possession of his own land, the possession ought not to be again given to the other party.‖ (a)

T. *Sedgwick*, and *Henry*, contra, contended,

1. That no writ of error would lie in this case. The supreme court had jurisdiction. The issuing and delivery of the writ of *certiorari* gave jurisdiction *instantly*, so that there could be no further proceeding whatever before the justice.** It is true, that parol evidence of the contents of the writ or return is not admissible; but this rule does not apply in *summary* proceedings, in the same court, from which the writ issued. The writ supersedes all proceedings in the court to which it is sent or delivered.†† When the justice received the writ, his jurisdiction ceased. His power of proceeding was at an end. And it would be monstrous if no court had jurisdiction of the matter. The supreme court had power to enforce a return to the writ, by an attachment. Where a court proceeds *summarily*, so that an issue in law or in fact is precluded, no writ of error can lie. Here is *no fact* confessed, or found, and without such fact, *no*

* 3 *Bac. Abr. Forc. Ent. and Det.* (E.) 255. *Palmer,* 277- *Dalton,* 44.
† 7 *Johns. Rep.* 543.

‡ 8 *Johns. Rep.* 48.

§ *Hawk. Pl. Cr. b* 1. *c.* 65. *Comber.* 328. *Cro. Eliz.* 576. 2 *Salk.* 587. *Dyer,* 123. *pl.* 24. 1 *Keb.* 343.

‖ 4 *Johns. Rep.* 158. *per Spencer,* J. 1 *Johns. Rep.* 44.

** 1 *Bac. Ab. Certio.* (G) 570, 571. 2 *Hawk. P. C. c.* 27. *s.* 64. *Lord Raym.* 835. 1305.

†† *Yelv.* 32. *Hal. P. C.* 215.

(a) See *The People v. Leonard,* 11 *Johns. Rep.* 504.

*IN ERROR.*

·····

ALBANY,
April, 1814.

CLASON
v.
SHOTWELL.
* 3 *Bl. Com.*
896, 897.

judgment of law, according to the definition of *Blackstone*,* which was not fully stated by the other side, can be given. There is no precedent for such a record, as the papers before the court are improperly called. The form of the judgment stated in this pretended record, is not justified by the proceedings below. The words "*therefore it is considered*" are never used by the court in deciding on *motions*. The record is not a *judgment roll*, though signed by the clerk; it has been made up by the attorney of the plaintiff in error. In the cases relative to *statutes merchant* and a *fine*, there is a judgment of law, on which an execution may issue. There are many decisions and determinations of the supreme court which are *final*, and which affect the person and property, but on which no writ of error can lie; as in *amerciaments*, granting *new trials*, relieving *bail* who are fixed, *mandamus*, *prohibition*, and in numerous other cases which might be mentioned. If the party complains that he is aggrieved by the supreme court granting an execution erroneously, is it possible that a writ of error lies to this court?

† 1 *N. R. L.*
131, 132.

Again, this court, having only an *appellate* jurisdiction, cannot decide on *facts*. The act† organizing this court, from the generality of the expression, might, perhaps, lead to a different conclusion. But in construing that act, we ought to look to the *English* statute, from which its provisions were taken. The stat. 27 *Eliz.* c. 8.‡ has the same general words. The writ of error is to go to the chief justice, to cause " the record and all things concerning the same," &c. to be brought before the judges of the *exchequer chamber*. Our statute did not intend to confer larger powers on this court than is conferred by the *English* statute on the court of the *exchequer chamber*; and it has been decided, that the statute of 27 *Eliz.* c. 8. does not extend to errors in fact.|| If this court, then, from the nature of its organization, cannot decide on facts, the present cause is not legally before the court. If there had been a return to the *certiorari*, there would then have been a *record* of the supreme court, which, in itself, would be absolute verity, and preclude all inquiry as to facts. No rule or decision of the supreme court, *on motion*, is final; but is open to revision in that court, and is often reviewed, and the rule before granted is vacated, modified, or enlarged, in the discretion of the court. There

‡ See *Bac. Ab.*
*Error*, (I.) s. 2,
480.

|| 2 *Bac. Ab.*
*Error*, (I.) s. 6.
2 *Lev.* 38.
*Vent.* 207.
*Cro. Jac.* 5.

can be no occasion, therefore, for a writ of error to this court.

Where the proceedings are *summary*, no writ of error lies.* There is no *judgment* of the supreme court, legally and technically speaking, in this case. The writ of *certiorari* was not returned, and there is nothing brought up here by the writ of error; for there could not, and ought not, to be a *record* in the case. It is inconsistent to allege that the affidavits are to stand in place of a return to the writ, and are the subject of a record; for the dispute is about the *facts* set forth in the several affidavits.

2. A *discretionary* power, in cases like the present, is *necessarily* and properly reposed in the supreme court; nor can it be taken away, unless by an express act of the legislature.

Again, the supreme court may travel out of the record, in order to do justice. The *force* may be traversed, and if the justice refuse to receive such traverse, the supreme court may hear affidavits of the facts, and order re restitution.†

The cases cited to show that a *certiorari* might issue to the executor or administrator of the justice, can apply only to cases where a person has the *record in his custody*. But the executor could no more make up a record, or return to the *certiorari*, than the deceased justice himself. No person can make the return when the justice is dead. The supreme court having a general and supervisory power over all inferior jurisdictions, must, *necessarily*, have jurisdiction in such a case, *on motion*, without writ, since there was no other way of exercising their power. A careful examination of the cases cited in the court below, in support of this point, will show that they bear no other construction than that put upon them by the supreme court.

3. The justice clearly acted *officially*, in awarding restitution; and he left a sufficient memorandum to show his proceedings. He acted in virtue of his office, and on the statute, and it was so considered by all the parties present.

4. On quashing a conviction, an award of re-restitution is matter of course;‡ if it is not, still it is a matter resting in the sound discretion of the court, and they have exercised that discretion in this case. It appears, that the justice made *Shotwell* give up the keys; this put him out of possession, and a re-restitution was then proper.

* *Vin. Ab.*
*Certio.* (D.)
*Ib Error*, (G.)
2 *Tidd. Pr.*
1078, 1079.

† *Roy v. Stacey,*
1 *Sid.* 287.

‡ 1 *Caines,* 126.
2 *Caines,* 99.
*Cro. Eliz.* 31.
1 *Str.* 474.

Again, this writ of error is brought by *Clason.* But the party complaining below was *De Peyster,* the person put out of possession by *Shotwell. Clason* must allege a privity of estate; but that can be no reason for substituting himself as prosecutor, in the place of *De Peyster.* If *Clason,* with others, were compelled to appear in the court below, they should all have been made parties in the writ of error, or have been summoned and severed.

*Burr,* in reply, contended, that the doctrine of summons and severance could not apply to a case of this kind, so entirely new, and without precedent. Besides, it is too late now to make the objection, as the non-joinder of others can only be urged in abatement. That a writ of error lies in this case, is to be shown from analogy, rather than from direct precedent; there may be such an injury in this new proceeding of the court below, as, in every view of the subject, ought to be revised. The powers and jurisdiction of this court are sufficiently ample, wherever the decision of the court below is *final,* and there can be a *record.** Now, here is a *record* before the court; though without precedent, yet having form and fact.

*6 Johns. Rep. 602.

. It is said that the proceeding of the supreme court was *summary.* It is that of which we complain. The statute has prescribed the mode of proceeding in cases of forcible entry and detainer; and if the statute had been followed in this case, there would have been a *record,* according to old precedents, on which, it is admitted, a writ of error might be brought.

On an *order* of the court of chancery, in any stage of the suit, an *appeal* may be instantly made to this court; and we have never heard of the inconvenience arising from such a course. It is difficult to perceive why greater danger or inconvenience would result from allowing writs of error to be brought on the orders or decisions of the supreme court.

The court below assumed the ground that there had been a *judicial* proceeding before the justice, or that he acted *officially,* under the statute. But if the affidavits are examined, it will be seen that, really, there was nothing *judicial* or *official* in his proceedings. The party had himself taken his remedy, with his own hands, before the justice arrived. And where a party, having right, takes the possession himself, that possession is

IN ERROR.
.....
ALBANY,
April, 1814.

CLASON
v.
SHOTWELL.

good, and will not be disturbed. All the party can be liable to, is punishment for a breach of the peace.(a) As to the *complaint* said to have been made to the justice, it nowhere appears, that the justice went to the spot, in consequence of such complaint. The proceeding, as stated in the affidavit of *Briggs*, negatives all idea of the justice having acted *officially*, or as a justice of the peace, in a criminal proceeding. He merely advised the parties as to what ought to be done. The justice never acted on the complaint of *De Peyster*. All that he did was at the request of *Briggs*, and in order to protect him. The justice made no *record* of his proceeding; and it is not to be supposed that he would have proceeded legally and solemnly, under the statute, and have wholly neglected to make any official note or *record* of his proceedings. The shred of a return, so called, collected by *Shotwell*, *Briggs*, and the attorney for the plaintiff in the *certiorari*, ought not to be regarded. The supreme court have censured an attorney for interfering to make a return for a justice.

Again; the provision of the statute relative to *attornments*, shows that *Clason* was, all the time, virtually in possession; and that a *re-restitution* was impossible.

The powers and jurisdiction of the supreme court are to be found in those of the courts of *C. P.*, *K. B.*, and *exchequer*, in *England*, and in our statutes. No such proceeding as that of the court below can be found ever to have taken place in either of the three *English* courts mentioned. The case cited from *Siderfin* is the same as that of *The King* v. *Chaloner*, and came up on *habeas corpus*. There is no mode of commencing or introducing a suit to the supreme court, upon motion, except what the ingenuity of counsel may discover.

No doubt, the jurisdiction of the justice ceased on the writ of *certiorari* being delivered to him; but the supreme court did not, therefore, acquire jurisdiction of the cause. That court had jurisdiction over *the justice*, and might constrain him to make a return to the *certiorari*; but until the writ was returned into the clerk's office, the supreme court had no jurisdiction of *the cause*. These proceedings, therefore, were *coram non judice*. Is this court prepared to say, that suits may hereafter be com-

---

(a) But see *The People* v. *Leonard*, 11 *Johns. Rep.* 594.

menced, without writ, on affidavits? The consequences of such a doctrine ought well to be considered. A wide door would be opened to perjury. But the greater evils would be, that facts would be determined without the intervention of juries; and parties would be deprived of the right of appeal, or of obtaining a review of the decision of the supreme court, however erroneous their judgment might be.

The Chancellor. The preliminary question in this case is, whether a writ of error will lie upon the matter before us.

Assuming the writ to have been properly brought, the question on the merits, though extremely simple, is, comparatively, of little moment; and was there no other point for discussion, I should have been silent, not from any doubt of my constitutional right, as *chancellor*, to speak and decide on the case, but from motives of delicacy, as I wish not to sit in review of decisions assented to or pronounced by me, as *chief justice*, in the court below.

But the point now under examination did not, and could not, arise in the supreme court; and for the more full and complete view of it, I shall be obliged to touch on the whole matter of the case, and shall submit the reasons and authorities by which I am convinced, to the candid and intelligent consideration of the court.

The leading facts are few. On the fifth of *February*, 1813, *George De Peyster* went to *Elijah Williams*, a justice of the peace in *Westchester* county, and entered a complaint of a forcible entry and detainer of his messuage and dwelling house, by *Gilbert Shotwell*. Upon this complaint, the justice immediately repaired to the premises, and found the family of *Samuel Briggs* in possession; and he also found that *De Peyster*, with *Thompson*, his attorney, and several other persons, had arrived there before him, and were occupied in emptying the house of its furniture. *Briggs* refused to surrender the possession of the house, and the justice directed him to be taken into custody, which was done accordingly, and in the presence, and with the sanction of the justice, the house was completely cleared of *Briggs's* family and effects.

This is the substance of the case, as taken from an unfinished record or return, which the justice had prepared to the *certiorari* issued and delivered to him, and as taken from the justice

IN ERROR.
•••••
ALBANY,
April, 1814.

CLASON
v.
SHOTWELL.

himself while *in extremis*, and lying on his death bed. It is, therefore, to be considered as equal to an official statement under the magistrate's oath, for the return must have been drafted under the impression of that sanction; and dying declarations are generally uttered and received as of equal solemnity.

But this imperfect return of the justice was aided and supported by a number of affidavits to the same effect, and so far from setting up a want of jurisdiction in the supreme court to take cognizance of the case, the record shows that *Isaac Clason* and *George De Peyster,* when called upon to answer, produced a number of counter affidavits, and submitted the case, upon the conclusions to be drawn from the affidavits on the one side as well as on the other.

The supreme court made no further decision in the case than to restore *Shotwell,* or *Briggs,* as his tenant, to the possession of the house and farm from which he had been so irregularly expelled. The justice stated that *Briggs* was convicted, under the statute, of a forcible detainer, but the supreme court did not touch that conviction. The record shows that they did nothing more than award re-restitution to *Shotwell,* and that nothing more was prayed for on his part; and this fact becomes very material; for, as I shall show hereafter, re-restitution is a matter resting in the sound discretion of the court, and no writ of error lies upon a matter resting in discretion. If the supreme court had intermeddled with the *conviction* of the force, by either affirming or quashing it, error would have lain upon *that* decision; but in this case the court did no such thing, nor does the record allege any act of the court, but the single act of ordering re-restitution to *Briggs.* The justice was authorized by the statute under which the complaint was made, to fine and imprison upon his own view and conviction of the force. Such a conviction would have been legal; but possession cannot be changed, without the intervention of a jury, and if the justice takes that step, on his own view, he does an unauthorized act. He did such an act in this case, and it was that grievance, and that only, that the supreme court redressed. They confined their interference (I speak from the record before us) to the unlawful change of the possession; and upon affidavits, as applicable to *that* fact, they awarded restitution to *Briggs.* We have, then, at present, nothing to do with the conviction or the

evidence of it. This is not the point before us, nor was it the ground of application to the supreme court. The whole prayer, in that court, was to be put back into possession, and the whole complaint here is, that the supreme court, upon facts disclosed by affidavit, thought proper to restore *Briggs* to his possession.

I am prepared to show that this proceeding by affidavit was usual and regular.

Even if the cause below had been placed on the legality of the conviction of the force, and not on the legality of the *ouster* of possession, the court had sufficient matter before them to give them cognizance of the case. A *certiorari* had been sued out and served, and the justice made an imperfect return, but before he completed it, he died. The court, in such a case, was bound to be indulgent, and to accept of the imperfect return, aided, as it was, by the death-bed declarations of the justice. Such a course is essential to the due preservation of private right, and is dictated by common sense as well as by justice and humanity. It is the maxim of law, that the visitation of Providence works no injury. The law is not so technically nice as to sacrifice substance to shadow. It is a more reasonable system. It is, indeed, a collection of written reason, and is never assailed by ridicule, except by those who either do not understand, or who mean to pervert it. If a judge at the circuit happened to die after taking the verdict, and before the return of the *postea*, the ancient law allowed the verdict to be returned by the clerk, though if the judge had been living, he was to make the return. (*Jenk. Cent.* 216. pl. 59.) So, if a justice takes an inquisition, or records a riot, he may deliver the record into the K. B. with his own hand, without a *certiorari*. (2 *Hawk.* b. 2. c. 27. s. 44.) Those who cultivate the law as a science, know that it is a collection of principles, and if the case furnishes a principle, it then furnishes a rule for decision.

But all I need show, at present, is, that if the question be on the regularity of the possession gained, (as it was here,) it always *may*, and often *must*, depend upon matter of fact to be disclosed by affidavit. For this we have the case of *The King* v. *Chaloner*, K. B. 15 *Charles* II. (1 *Sid.* 156. 1 *Keb.* 572. 585. 1 *Lev.* 113. *Com. Dig.* tit. *Forcible Entry and Detainer*, D.) which affords a precedent, complete and full to the very

*IN ERROR*
.....
ALBANY,
April, 1814.

CLASON
v.
SHOTWELL.

point. In that case, the K. B., as early as the year 1663, awarded a re-restitution, founded upon affidavits. The case was shortly this : the defendants (being father and son) were convicted of a forcible detainer, upon the view of two justices of the peace, and fined and committed to gaol, and possession of their farm given to one *Smith.* These defendants were brought into the K. B. upon *habeas corpus,* and offered to submit to their fine, but to the end that the court might award restitution, it was shown by several affidavits that one of the defendants (the father) had been in possession for 13 years, and that *Smith,* pretending title, had procured the two justices to go with him to the premises, and had used this contrivance to gain possession, for which conduct, the court directed a prosecution against *Smith* and the two justices, and, after several motions, the court awarded re-restitution to the two defendants, and held that the possession given to *Smith* was illegal, for that the justices, upon their own view, intermeddled with the possession. It was then moved that the conviction before the justices be quashed, and it was much debated whether *that* could be done on motion, without the conviction being duly removed into the K. B. by error. With this last point we have, at present, no concern. It may or may not have been correctly decided. The case of *The King* v. *Elwell (Str.* 794.) contains a different rule. But the case of *The King* v. *Chaloner* is strikingly analogous, and is a direct and unshaken authority on the principal point, viz. that the party who had been dispossessed of his farm by two justices, upon their own view, without a jury, and at the instance of a third person, who pretended title, was reinstated in his possession by the K. B. upon *motion and affidavits.* In all the books in which this case is reported or referred to, there is no disagreement on this point. It stands as good authority, and it completely vindicates the jurisdiction and course of proceeding exercised in this case by the supreme court. The present affords, indeed, the stronger reason; for in the case from *Siderfin* the two justices were living, and a regular and formal return of their proceedings could have been demanded and enforced. Here the injured party was deprived of that resource by the act of God, and could hope for nothing but the heads and fragments of a return. It is scarcely necessary to observe, that the bringing up of the body of the party into the K. B. upon *habeas corpus,* was not a removal of

the record of conviction. Those are totally distinct operations. The party may be discharged on *habeas corpus*, and yet the conviction below remain undisturbed. (*Holt*, Ch. J. in *Groenvelt v. Burwell*, 1 Ld. Raym. 454.) So, quashing a conviction, and awarding re-restitution are very distinct acts, without any necessary connection. The conviction of the force may be legal, and yet the *ouster* of the possession lawless.

There are many other cases to be found in which the question of re-restitution has depended entirely upon facts disclosed by affidavit. Thus, in the case of *The King* v. *Stacey and others*, (1 Sid. 287.) and again, in the case of *The King* v. *Bengough*, (3 Salk. 287.) the inquisition of a forcible entry and detainer being removed into the K. B. re-restitution was awarded upon affidavit that the defendant was not permitted to traverse the force. In such cases the question of re-restitution must depend upon matter *aliunde*. The record sometimes will, and at other times will not, disclose sufficient for the court to determine whether the possession was lawfully changed, or, indeed, whether there was *any* change of the possession. In the last cases cited, the refusal to receive a traverse of the force, did not appear by the record, and the court were obliged, in order to prevent manifest injustice, to receive proof of the fact by affidavit; and if they are to receive affidavits on one side, they are bound to admit counter affidavits on the other, and the question of a legal or illegal *ouster* of possession must depend upon the *credit* due to the affidavits, of which credit the supreme court, and that court only, can be the judge.

I have thus shown, and, as I trust, to the satisfaction of every one, that the proceeding in the supreme court, upon the question of the restitution of *Briggs*, was regular, and supported by established usage. It is next to be shown, that the application for re-restitution was an application to the sound discretion of the court; as much so as an application to hold to bail, or to relieve special bail, or to set aside a default, or to change the *venue*, or to award a new trial; and if I establish this point, it will follow, of course, that error cannot lie.

The general rule laid down in all the abridgments and elementary works, is this: that the K. B. has a discretionary power over the point of re-restitution, and that this power flows from an equitable construction of the statutes concerning for-

IN ERROR.
.....
ALBANY,
April, 1814.

CLASON
v.
SHOTWELL.

cible entry and detainer. If, then, it shall appear that restitution was illegally awarded by the justice, or was illegally executed under his order, the K. B. may set it aside, and grant re-restitution, if, upon the whole view of the case, they should deem it just and equitable; but the defendant cannot demand this summary interference, as of strict right, (*ex rigore juris*,) for it rests upon the equity of the court. (*Viner*, tit. *Forcible Entry and Detainer*, O. 2. *Bacon*, h. t. G. *Hawkins*, h. t. b. 1. c. 64. § 63.) This doctrine, as I have stated it, is to be found in all the books which treat on this subject. It has existed for time immemorial, and has never been questioned, in a single instance, from the earliest periods of the *English* law down to this day. It was expressly conceded in this case by the opening counsel for the plaintiff. I will, notwithstanding, in order to make "assurance doubly sure," cast my eye over the leading cases; for this point being once well established, and it being also apparent, from the record itself, that this was the only point in the court below, and the only point before us, the argument against the legality of the writ must force itself upon the mind with all the weight and certainty of a mathematical demonstration.

The general rule first appears in *Dyer*, (2 *Dy.* 122. b. pl. 24.) as early as the 2 and 3 *Ph.* & *Mary*, that the K. B., notwithstanding the tender of a traverse to an indictment, under the statute to prevent forcible entries and detainers, might grant or stay restitution at their discretion. In *Fitz-William's* case, 45 *Eliz.* K. B. (*Cro. Eliz.* 915. *Yelv.* 32.) there is a practical illustration of the principle. That was an indictment under these statutes at the quarter sessions, and restitution was awarded to the party, after a *certiorari* had been delivered from the K. B. It was accordingly held to be irregular, as the delivery of the *certiorari* was a *supersedeas* to the power of the justices; but the court said the awarding of re-restitution was but matter in the discretion of the court, and as they conceived here had been an abuse, re-restitution was awarded. Again, in the case of *The King* v. *Ford*, 4 J. 1. (*Yelv.* 99. *Cro. Jac.* 151.) there was a conviction and restitution made by justices of the peace. The record being removed by *certiorari* to the K. B. the indictment was held ill; but on the question of re-restitution, there were only three judges, out of five, for granting it, as it was a matter resting in their discretion, and there was a dif-

ference of opinion as to the equity of the case. In the case of *The King* v. *Burgess*, 15 *Ch.* II. K. B. (*T. Raym.* 85.—1 *Keb.* 343.) and which was 60 years subsequent to the former case, we find the Justices *Twisden* and *Kelyng* laying down the same rule, that restitution was of duty, but that re-restitution, (meaning the summary interposition of the K. B.) was of grace and discretion. In the following age, during the time of Lord *Holt*, we find it stated by him in *St. Leger* v. *Pope*, 7 *Wm.* III. (*Comb.* 327.) to be usual when an inquisition of a forcible entry or detainer was quashed to grant re-restitution, but that the court were not bound to do it, *ex merito justiciæ;* and, therefore, in *Rex* v. *Toslin*, 10 *Wm.* III. K. B. (*Salk.* 587.) we meet with an instance of an inquisition of forcible entry being quashed, but re-restitution denied.

I will cite but one case more from the *English* books: the case of *The King* v. *Marrow*, 9 *G.* II. K. B. (*Cas. temp. Hardw.* 164.) decided while Lord *Hardwicke* was chief justice of the K. B., and in which the rule is laid down with great certainty and precision. It was the case of an indictment, of a forcible entry, removed by *certiorari* to the K. B., and on motion for re-restitution, Lord *H.* cited and adopted the observations in *Dalton*, (*Justice*, ch. 134. p. 319.) that restitution was a thing in the discretion of the court, and that they could grant or deny it, as the justice and reason of the case should require.

We have a case to the same point decided in the supreme court, in *August* term, 1803. I allude to the case of *The People* v. *Shaw*, (1 *Caines*, 125.) and I cite it with the more satisfaction, because the opinion was delivered by a judge who is now a member of the senate,* and who must be able to appreciate and render full justice to the accuracy of my illustration of this rule of law. In that case, there was an indictment for a forcible entry and detainer, a conviction thereon, a delivery of possession to the complainant, and a subsequent removal of the record into the supreme court. The court held the indictment erroneous, and set aside the proceedings, and awarded re-restitution; but *Lewis*, Ch. J. in delivering the opinion of the court, observed, " that from the general discretionary power which the court had in these cases, they might set a restitution aside, and award re-restitution, whenever it should appear that restitution had been illegally awarded,

* *Lewis,*
formerly Ch. J.

either for insufficiency or defect in the indictment, *or other cause."*

I presume I have now produced cases sufficient to satisfy the most sceptical mind, that the supreme court had a discretion in this case, to determine whether it was fit and expedient to reinstate *Shotwell,* or *Briggs* as his tenant, in the possession of the house and farm from which he had been so violently ejected. And the importance of this power to the public welfare may be expressed in the words of Mr. Justice *Spencer,* when delivering the opinion of the court in *Lanton* v. *The Commissioners of Highways,* (2 *Caines,* 179.) "The necessity," he observes, " of a superintending power, to restrain and correct partialities and irregularities which may be committed by inferior officers, is so obvious and indispensable, that the court ought, by no means, to deny themselves a jurisdiction of such salutary influence." Being a matter resting in the sound discretion of the court, the exercise of that discretion is not the subject of review on a writ of error. This is another point, which I will now undertake to illustrate.

There seems to be no position more uniformly admitted, than that error will not lie on a matter resting in discretion. It is upon this ground that applications for new trials; or for setting aside defaults and judgments ; or for changing the venue ; or for time to plead, or to withdraw, or amend a plea ; or to hold to special bail ; or to relieve or mitigate bail ; or to award or deny a *mandamus* or a *precedendo ;* and applications on numberless other points arising in the progress of the suit, or in the ordinary details of the administration of justice, cannot be reviewed by a writ of error. There is this difference, as stated in the commentaries of *Blackstone,* (vol. III. 55.) between appeals from a court of equity, and writs of error from a court of law : that the former may be brought upon any interlocutory matter, the latter upon nothing but only a *definitive judgment.* It may not be amiss, however, to fortify this general doctrine by a few adjudged cases. It might, indeed, be left to rest upon the fact, that there is no precedent in the books of a writ of error, in any such case, and this affords a strong presumption, in law, that no such writ will lie. It is inconceivable that there should not be one instance to be found, of error brought upon any of the numerous acts of discretion almost

IN ERROR.
.....
ALBANY,
April, 1814.

CLASON
v.
SHOTWELL.

daily exercised by the courts, if it had been understood that error could have been sustained. The silence of the law on this point, is eloquence itself.

But the books speak also in affirmative language. It is well known that an application for a *mandamus* is an application to the discretion of the court, who will grant or refuse it, as justice and equity shall require; and yet it has been held in the house of lords, in the case of *The King* v. *The Dean and Chapter of Trinity Chapel, Dublin,* (2 *Bro. P. C.* 554.) and again, in the case of *Pender* v. *Heale,* (3 *Bro. P. C.* 178.) that a writ of error would not lie upon the determination of the K. B. to grant or to refuse a *mandamus.* So, on appeal from an order in chancery, appointing a guardian on the ground that the selection was not well made, the house of lords dismissed the appeal, because the chancellor had a discretionary power in the selection of a guardian. (*Preston* v. *Ferrand,* 2 *Bro. P. C.* 179.) This doctrine is explicitly acknowledged in the jurisprudence of this country. Thus, in the case of *Burd* v. *Lessee of Dansdale,* (2 *Binney,* 80.) the supreme court of *Pennsylvania* decided, in a case of error from an inferior court, that on the refusal to grant a new trial, error did not lie, though the reasons of the court were reduced to writing, and entered of record, for they observed that motions for new trials were often founded upon equitable circumstances, in which much is left to the discretion of the judge. The high court of errors and appeals in *Pennsylvania* settled a principle governing this very case, as they are stated (2 *Binney,* 91.) to have decided that a writ of error did not lie on a decision of their supreme court on a motion unconnected with the trial of a cause. So it was decided in the supreme court of the *United States,* in the case of the *Marine Insurance Company* v. *Hodgson,* (6 *Cranch,* 206.) that the refusal of an inferior court to allow a plea to be amended, or a new plea to be filed, or the refusal to grant a new trial, or to continue a cause, were matters which could not be assigned for error. " These matters," said Mr. Justice *Livingston,* in delivering the opinion of the court, " depended so much on the discretion of the court below, which must be regulated more by the particular circumstances of every case, than by any precise and known rule of law, and of which the superior court can never become fully possessed, that there would be more danger in revising matters of this kind, than what might result,

now and then, from an arbitrary and improper exercise of this discretion."

Here we have a series of decisions in the highest tribunals to which we can resort for precedent, or for which we can inculcate a veneration. These decisions establish these two points, 1. That the award of re-restitution, under the statutes of forcible entry and detainer, is not *ex debito justiciæ*, but rests in sound discretion; and, 2. That error will not lie on a decision depending on discretion. The argument, then, on the ground of authority, is conclusive. There is no escape from this conclusion. We must quash the writ of error, or we must, by a mere stretch of power, determine to make new law for the case.

But this rule is not only the positive law of the land, and as such, demanding our assent and obedience, but it is a rule founded on just and wise foundations of public policy, and it can be recommended to the good sense and to the good will of this court.

In the first place, such applications to the discretion of the court, are always supported by affidavits, and the court are called to weigh the credit of testimony, and to determine matters of fact. This court can never review such cases, without reviewing and judging upon the same testimony, which would be assuming a jurisdiction never confided to it by the constitution. The appellate jurisdiction of the *English* house of lords, was the model in the erection of this court, and it was intended only to review the final judgments of the supreme court upon matter of law. Every court of original and competent jurisdiction must be clothed with summary and discretionary powers over a vast field of undefined matter, constantly arising, and necessarily incident to the due administration of justice. This will be the case particularly with the highest court of common law, in which the deposite of great confidence, as well as of great power, becomes indispensable to the public safety.

Another reason why error cannot lie upon these cases of discretion is, that it lies only upon a decision that gives or concludes *the right* of the party, and such decisions, like the one now complained of, do neither. The question of re-restitution does not depend, necessarily, either on the legality or illegality of the *conviction* of a forcible entry or detainer. We have seen that the conviction may be good, and yet the mode of obtaining possession irregular; we have seen that the conviction

IN ERROR.
.....
ALBANY,
April, 1814.

CLASON
v.
SHOTWELL.

may be bad, and yet re-restitution, under the circumstances of the case, be denied. The question of re-restitution need not meddle with the question on the conviction. The one must appear by record, the other may appear by affidavit. When the court award re-restitution, they do not determine the right of possession. They decide only on the irregularity of taking possession under the statute, in the given instance, and they leave the party to go on immediately, and pursue the possession in a more regular way. The court may even permit the party to renew the question of restitution by new affidavits. The decision, therefore, does not touch or prejudice the right of possession, nor is it definitive in the case. It is not a *res judicata*, which could be pleaded in bar of a fresh application. Here was no judgment, in any technical sense of the term. Here were no facts, either found by a jury, or admitted by the party. We might as well consider the decision of the court upon affidavits to hold to bail, or to change the venue, or to set aside a default or an execution, as a judgment upon which error would lie. The return attached to the writ of error contains only a parcel of affidavits, made to support or to resist a special motion in the supreme court. Every lawyer, of the least technical learning, must know and feel the absurdity of calling the paper book before us, a record or judgment containing the conclusions of law. How is it possible for this court to sit as jurors to determine on the credit due to these contradictory affidavits? And yet, how could we otherwise know whether the writ of re-restitution was or was not discreetly awarded? Was such a writ of error ever before heard of in the annals of any appellate jurisdiction? We have seen that the statutes, of which so much has been said, and that this power, exercised by the supreme court, were in existence and activity, as far back as the reign of *Elizabeth*; and these statutes have been re-enacted here, when the power in question, as grafted upon these statutes, was as well known and settled as any branch of the law. No alteration, no amendment, was made by the legislature. In short, the very bringing of a writ of error in this case, will be thought by many to be a reflection on this court. It implies that its character abroad is a character of infirmity. It looks like an experiment to see to what extreme depths of degradation we might be conducted. But I have no apprehension of such results. The community are bound to place higher confidence in the talents and learning of the pro-

IN ERROR.
.....
ALBANY,
April, 1814.

CLASON
V.
SHOTWELL.

fessional, and in the understanding and firmness of the unprofessional part of this court. When a case arises which strikes at first principles—which touches the deep foundation of the law, I presume that *all* will zealously unite in protecting the fair fabric of our jurisprudence.

But we are told that the power exercised by the supreme court is dangerous to public liberty, and must now, for the first time, be controlled, even by the assumption of an unprecedented power in this court. This language ought, at least, to have been supported by some strong case of oppression. Hard cases, I know, do sometimes make bad precedents. The imagination is inflamed with the passions, and the heart seduces the judgment. But here there was nothing done which a good man ought to wish undone. Let us look, for one moment, into the merits of the case, and I am persuaded we shall find nothing in the decision which ought to awaken the sensibility, or disturb the moderation, of the court.

*Samuel Briggs*, of the county of *Westchester*, happened, on the fifth of *February*, 1813, to be tenant to *Gilbert Shotwell ;* and he was, on that day, with his family and goods, suddenly and violently, turned out of his house, into the street. The prosecutor, at whose instance this act was performed, was, ostensibly, *George De Peyster*, but, really, *Isaac Clason*, a merchant of the city of *New-York*. And how was this ejection of *Briggs* and his family effected ? If we do not applaud the end, we cannot but admire the means. In the evening of the preceding day, *De Peyster*, in company with *William A. Thompson*, his attorney, came to the house of the deputy sheriff, and delivered to him a writ against *Briggs*, and requested him to serve it on the next day, at *Briggs's* house. Let us mark this fact ; it is disclosed by the deputy himself. In the afternoon of the next day, or the fifth of *February*, *Briggs was arrested* at his house, at the suit of *De Peyster*, in the sum of 3,000 dollars ; and to procure bail, he was taken to his father's residence, a distance of three and a half miles. While he was in this manner detached from home, the complicated plot was unfolded. *De Peyster*, in company with *Elijah Williams*, a justice, and *William A. Thompson*, the attorney, came to his house while absent, and began to turn his family and furniture out of doors. On his return, before they had finished the work, he remonstrated ; but the justice and the attorney said it

IN ERROR.
.....
ALBANY,
April, 1814.

CLASON
v.
SHOTWELL.

was done according to law, and the justice ordered him into custody, because he would not give his consent ; and he was taken by the collar and led into the street. This I believe to be the plain unvarnished state of the case ; and the supreme court, deeming this proceeding altogether lawless, thought it their duty, in the exercise of a sound discretion, to reinstate *Briggs* in his possession. This is the act now complained of. The court held it to be a clear point, that no change of possession can take place, under the statute, until the justice has summoned a jury of twelve men, to determine, upon their oaths, the existence of the force. By dispensing with this admirable security of private right, the whole proceeding was irregular. If *Clason* had unduly lost the possession in the *October* preceding, as was suggested, he should have called upon the aid of the law to regain that possession. It formed no apology for this oppressive and violent proceeding. The law has a tender regard for the asylum of a private dwelling; *debet sua cuique domus esse perfugium tutissimum.* The court were not to travel back to former transactions. They could only look to the character of the case before them, and it really appears to me, that no man, whose moral sense is not perverted, can think of it, or can speak of it, without indignation. It is in vain to pretend that this was a mere private trespass, for which the injured party had his private action. The case wears a graver aspect. Here was a justice of the peace, who appeared clothed in the authority of a magistrate, and professing to act upon a complaint made to him under the statute against forcible entry and detainer. This was avowed by him at the time. It was avowed by him in the record he had drafted. It was avowed by him with his latest breath. Here was, also, an attorney, who was reading from a book, and declaring the same thing. The poor, affrighted victim, would have made resistance to a mere private trespass. But he was overawed by the sounding titles of law, and magistrate, and attorney ; and those symbols of right to which a good citizen is disposed to pay respect and obedience, were shamefully prostituted in this unworthy transaction. Was it not, then, the bounden duty of the supreme court to restore *Briggs* to his possession, and thus to exercise the discretionary power with which they were clothed, and which had been sanctioned by the experience of ages? Were they to sit still and suffer

IN ERROR.
.....
ALBANY,
April, 1814.

CLASON
v.
SHOTWELL.

the forms of law to be so grossly abused ? Is there any thing, at least, in the act of the supreme court, so extraordinary, as to warrant this court, in its anxiety to redress it, to usurp a jurisdiction which the constitution never intended, and which is unknown to the law ?

But this court is advised to construe with great liberality its power of review, and it is even asserted, that its capacity to sustain writs of error is greater than that of the *English* house of lords. As I consider such doctrines to be alarming heresies, and dangerous to our constitutional rights, I must beg the patience of the court, while I bestow a few thoughts on their merit and tendency.

My position is, that a writ of error will not lie here, except upon a final judgment of the supreme court upon a question of law, and that our constitution and statute intended to go to the extent of the *British* usage on this point, and no further. This is evident, from the language of the constitution and the statute, and from the whole scope and structure of our judicial system. No other construction can preserve its value, its safety, its symmetry, and proportion. It appears to me also to be the dictate of sound policy, and, for reasons which cannot but be felt by every member, that this court should not exercise appellate powers but in cases of clear and undoubted jurisdiction. If writs of error ought to be more extensively applied than they now can be under the existing rules and usages of law, we have a legislature always ready and able to afford every requisite remedy ; and this, I presume, will be admitted to be the legitimate mode, if any there be, of enlarging the powers of this court, so as to embrace cases depending on discretion. But if we had the right, we ought to weigh well the mischief of creating the precedent of writs of error upon mere collateral and discretionary proceedings in the supreme court. If an execution in ejectment be irregularly issued, the court will set it aside, and restore the possession. This is a very ordinary case of jurisdiction; (*Dacres* v. *Doe*, 2 *Blacks. Rep.* 892. *Goodright* v. *Noright, Barnes*, 178. *Anon.* 2 *Salk.* 588.) and yet, upon the new doctrine, a writ of error would lie even for setting aside an execution. It must equally lie in every stage of a cause, and upon all those numberless acts and decisions to which I have alluded, and which spring up almost spontaneously in the progress of a suit. The bounds of the

IN ERROR.
.....
ALBANY,
April, 1814.

CLASON
v.
SHOTWELL.

supreme court would equally be enlarged; and *that* tribunal would be oppressed with writs of error from the collateral decisions in each of the numerous courts of common pleas; for they all have a like discretion, so far as may be incident to the cognizance of causes. If every order, in every such case, founded upon affidavits, be a *judgment* on which error may be brought, it must lie as well from a county court to the supreme court, as from the supreme court to this. And what a harvest would then arise for the activity of the profession? No considerate man can contemplate, without terror, the abuses of such an innovation. A wise lawyer will, no doubt, provide competent organs, through which all private rights may be pursued, and all private injuries redressed, but he will never open, too wide and too freely, the door to the never-ceasing spirit of litigation. If he does, law-suits will become a public grievance. Justice will be strangled by the very means devised for her protection. The delay, vexation, and expense of suits, will become intolerable. We are all, no doubt, apprized of the heavy tax to suitors which appeals to this court produce, not only by the sum in which the losing party is amerced, but by the heavy *extra* fees which each party is obliged to pay to their learned counsel. If we become, therefore, too loud and seductive in our calls for business, and if we open to the sharp-sightedness of avarice new avenues to litigation, we shall, most assuredly, perplex and agitate the whole current of justice. The love of gain, and the obstinacy of contention, are active as well as deep-rooted principles in the human breast. No man who can well afford it will desist from contending with his antagonist on every point, and on every motion capable of doubt, until he has taken his chance of a final decision in this court. The lover of quiet will hate such endless contention. The man of moderate means will become faint in the contest. Small claims will be relinquished as not worth the expense. The diffident suitor will yield to the presumptuous, and the rights of the poor will frequently be crushed under the overbearing oppression of the rich.

Nor must we indulge the hope, that this can be only an imaginary picture. I know better. The business in the supreme court depending upon affidavits, and not involving any final decision on the merits, is almost inconceivable. The average number of cases must certainly exceed five hundred, and, probably,

may a thousand, which are annually brought before that court upon special motion, and decided upon affidavits. Each of those cases are applications to the sound discretion of the court, and writs of error will lie on all those cases, and bring up all those enormous piles of affidavits, with just the same propriety that it will lie in this case. And can there be any member of this court who can even think of such an enterprise, without feeling *the whole head sick and the whole heart faint?* Can this court, for a moment, wish, and much less meditate, to depart from the precedents set us by the wise men who have gone before us, and of opening the door of review to such a flood of extraneous matter depending on the sound discretion of the courts of law? It would require our whole time for the whole year. Even then we should fail; for we could neither sustain the labour, nor command the attention. The attempt would terminate in public misery, and in our own confusion and disgrace. I speak, as to wise men, *the truth in soberness,* and, I hope, without offence. This court was never organized for such purposes. It is too numerous to consult together. It is pressed with other and higher duties. It cannot be familiar with the practice of the courts. It is not their art and science. It has not been their education and discipline. This tribunal is not competent to fulfil the judicial function, unless it follows the letter and spirit of the constitution, and confines its jurisdiction to " questions of law" arising on final " judgments." Such cases almost always present single, dry, elementary points, and are, in some sort, appeals to the moral sense and the common reason of mankind.

The spirit of litigation requires checks rather than excitements. We may all recollect the impediments which the legislature, a few years ago, very wisely threw in the way of the prosecution of one species of writs of error, I mean *certioraris* to justice's courts. The statute required the supreme court to disregard all defects of form in matter of law, and to decide on the very right of the case; and it limited the plaintiff's costs, if successful, to 25 dollars, but subjected him to full costs, if he failed. Yet there are, annually, upwards of 200 *certioraris* brought to a hearing before the supreme court, and many of them not of 5 dollars in value, and scarcely one of them that will defray the expense of the suit. It is probable that there are hundreds

IN ERROR.
.....
ALBANY,
April, 1814.

CLASON
v.
SHOTWELL.

beside which are never brought to a hearing, but the parties are coerced into an accommodation, for fear of the expense. We have also, at this very session, had eight cases brought up on writs of error from the supreme court and argued, and there were several more ready for argument, if the court could have afforded the time. I mention these facts to show that the facility of suing out writs of error, and the extent of the right, is already amply sufficient. There is also one other fact which I beg to bring to the attention of the court. The new revised laws of the last session have given an encouragement to writs of error, which is not known in *England*, and was never before known here, and which I did not discover until I saw the rule as drawn up the other day, in the case of *Spencer* v. *Southwick*. I confess the discovery struck me with astonishment and concern. I allude to the revised act, passed the 12th of last *April*, granting to the plaintiff in error his costs in error, at the discretion of the court, on *reversal* of the judgment below. This is making an unfortunate defendant in error pay, not for his vexatious or false clamour, but for the mistake of the court below, on a point of law, and in *England*, and in this country, until now, it has always been thought unjust. The common law gave no costs upon any writ of error, and the statutes of 3 *H*. VII. and 8 and 9 *Wm*. III. (which were adopted here without alteration in the former revision of our laws) extended only to cases of affirmance of judgments, and that very reasonably, said the court of *K. B.*, in *Wyvil* v. *Stapleton*, (*Str.* 615.) and that very reasonably, also, said this court, in the case of *Le Guen* v. *Gouveneur & Kemble*, in the year 1800, (1 *Johns. Cases*, 523.) when they unanimously concurred in opinion, that, on reversing a judgment or decree below, there were no costs in error; for the court said "it would be unreasonable to compel a person in case of a reversal, to pay costs for the error of the court below." It has, however, in the newly-revised statute, been ordained otherwise, but I hope and trust that this court, in its wisdom, will, at last, bar the door against writs of error in untried cases, where we have neither guide nor landmark.

There is also another fact on this subject of costs, which renders the sought-for innovation the more dreadful. I allude now to the new fee bill, passed last *April*, which has advanced the costs in litigated cases, in all the courts below, 25 per cent. and

IN ERROR.
.....
ALBANY,
April, 1814.

CLASON
v.
SHOTWELL.

In this court, in all cases, more than 100 per cent., and that by force of these additional words : " and other necessary entries or proceedings in a cause." The added words I mean are *or proceedings.* They are, apparently, very innocent and harmless, but the losing party will find that they are pregnant with power. I know the latent energy of those words. I have witnessed it in taxation. They make the party who fails, pay for all the voluminous cases distributed, at the rate of 1 shilling for every 72 words. In this very case, loaded as it is with affidavits, (and if error lies, they were all necessary,) I make the costs of the 33 error books amount to upwards of 800 dollars;(a) and all this an innocent party is to pay, and for what? for the error of the court below. Under all these alterations as to costs, would not this novel invention of bringing writs of error upon affidavits, become the source of the most tremendous oppression? And when I said that I could recommend the old established law to the good sense and the good will of this court, I ask now have I not succeeded?

They are extremely moderate and guarded in *England,* on the subject of writs of error. I will give to the court, on this point, an interesting fact. According to *Colle's* and *Brown's* parliamentary reports, (and which have collected all the cases to be found,) there were from the year 1697 to the year 1778, (a period of eighty years, and that, too, the most happy and flourishing in the *English* history,) only *sixty-four* cases in error brought to a hearing in the house of lords. We must conclude from this fact, that writs of error are there confined within very legitimate bounds, and that the suitor never presumes to speculate in new paths, nor to make large demands upon the credulity of the court.

Indeed, when we take into consideration the cautious and temperate spririt which pervades the *English* administration of justice, and the diffidence with which their learned judges exercise the power of review, it is no longer a matter of wonder, that their system of law should be as renowned for its stability as for its wisdom. And, since Providence has permitted that system to be established here, in all its maturity and perfection, it ought to be the just pride, as it is the bounden duty, of this

(a) The costs of the plaintiff in error, in this case, were actually taxed by the clerk at 845 dollars!

court to transmit it unimpaired to posterity, and especially to preserve the reputation which is due to the judicial character of this state.

I have now finished the question which I undertook to examine, and the following prepositions appear to me to be true:

1. That it was the usual and proper course for the supreme court to examine upon affidavits the regularity of the *ouster* of *Briggs*.

2. That it rested in their sound discretion, under all the circumstances of the case, whether or not they would order the re-restitution of *Briggs*.

3. That such an order is not the subject of a writ of error; and

4. That in justice and good policy, it ought not to be subject to one.

I am, accordingly, of opinion that the writ of error ought to be quashed.

LEWIS, Senator, was of opinion that a writ of error was properly brought in this case; and that the decision of the supreme court ought to be reversed.

WILKIN, Senator, was of the same opinion.

P. W. RADCLIFF, Senator, declared his concurrence in the opinion delivered by his honour, *The Chancellor;* and that on the merits, if it were proper to consider them, he was of opinion that the judgment of the supreme court ought to be affirmed.

YATES, Senator, concurred in the opinion of LEWIS, Senator.

SANFORD, Senator. Our first duty will be to inquire and determine whether this court has jurisdiction in this case. If we have no jurisdiction, we cannot proceed to examine the merits of the cause, but must simply dismiss the writ of error, for want of jurisdiction.

It is said that the decision of the supreme court was not a judgment.

In the books and language of the common law, the term judgment is applied in a limited, technical sense, to certain de-

terminations of the courts, which are enrolled in certain established forms and phrases. No other decision or sentence, however important or final it may be, is denominated a judgment. It is equally true, that in pure *English*, and in the ordinary sense of the term, it is applied to any determination of a cause by a court of justice. The judgment of the court is the final sentence or decree of the court. The expressions, " errors, correction of errors, judgments in the supreme court, and questions of law," which occur in the constitution, are not there used as terms of art. They are used in the ordinary and general sense of those expressions. The constitution ought not to be construed in this or any other part, with technical strictness and severity. It is not the act of a bench of judges, or a bar of lawyers. It is the public act of a numerous body, in which the representatives of the people speak in the language of the people, and address themselves to all mankind. Their language should, therefore, be understood according to the ordinary and usual sense of the terms which they employ.

The jurisdiction of this court is derived from the constitution, and the right of appealing to it is given by the constitution. The court and its jurisdiction, and the right of appealing to it, are unknown to the common law. They owe their origin and existence to the constitution; and the constitution is entirely an innovation upon the common law. Hence, the jurisdiction of this court is to be determined by the constitution itself, and not by expositions or definitions derived from the common law.

I also reject from this view of the question, the statute concerning this court. The statute organizes the court, according to the constitution, with such jurisdiction as the constitution had prescribed. The nature and extent of its jurisdiction are to be sought and found in the constitution itself. The powers of this court are as much to be found in the constitution, as the powers of the governor, the council of revision, or any authority created by the constitution.

The constitution appears to me to provide, that the supreme judicial power of the state shall be vested in this court; that it shall have appellate jurisdiction only; and that it shall hear and finally determine all causes which have been determined in the other courts, and may be removed to this court for revision. These are not, indeed, the expressions of the constitution, but

IN ERROR.
....
ALBANY,
April, 1814.
CLASON
v.
SHOTWELL

IN ERROR.
·····
ALBANY,
April, 1814.

CLASON
v.
SHOTWELL.

I use them as perfectly equivalent in sense and meaning to those used in the constitution. The authors of the constitution obviously meant, that one supreme tribunal should be erected, to which all courts then existing, or which might afterwards be created, should be subordinate; and that the administration of justice in those courts should not be final, but should be subject to the revision of this supreme tribunal. The supreme court and the court of chancery existed before; and all their decisions, of every kind and name, were final. The object of those who formed the constitution evidently was, that those courts should no longer possess that final jurisdiction. They, therefore, erected this court with an appellate jurisdiction, as broad and ample as the jurisdiction of all other courts. They left the supreme court its name, but they deprived it of that supremacy from which its name was originally derived.

The constitution, indeed, does not alter the forms of proceeding, or the modes of administering justice, which were before in use. But if any form of proceeding, or mode of administering justice, would have before excluded the right of appeal, then that form or mode is now so far altered by the constitution, that an appeal must be allowed. The right of appeal, given by the constitution, cannot be abridged by the common law, for so much of that law as interferes with the right of appeal, is abrogated by the constitution itself.

All judgments of the supreme court, by which I mean in the sense of the constitution, all final determinations of causes in that court, are, then, subject to an appeal and revision in this court.

But it is said, that if we depart from the technical definition of a judgment by the common law, every decision or order of the supreme court will be subject to appeal. This will not be the consequence. Orders merely interlocutory or auxiliary to the prosecution of a suit, are not determinations of a cause. No appeal can take place until the cause has terminated in the supreme court. This was the common law respecting writs of error. A writ of error did not remove the cause until final judgment had been rendered. This was not altered by the constitution, because it was not necessary to the right of appeal that it should be altered. The party against whom the supreme court may decide has the benefit of the constitutional provision, if he is allowed to remove the cause after the determination of

IN ERROR.
••••,
ALBANY,
April, 1814.

CLASON
v.
SHOTWELL.

that court. The rule of the common law, that a cause cannot be removed by writ of error, until after it has been determined in the inferior court, therefore remains unaltered. This is an answer to all that has been said concerning orders in the progress of a cause, rules upon parties and officers, and orders incidental to the main purpose of an action.

The proceedings of the supreme court, in this cause, were judicial proceedings, commenced, conducted, and terminated before them. One of the parties was called into court to answer the complaint of the other, and the court, having heard them both, decreed that the party who was in possession should be put out, and that the other should be put in. What may be the technical or most proper name for such proceedings, it is not here necessary to inquire or determine. It is enough that these proceedings have all the essential characteristics of a suit or action, and that the court have closed the litigation by a definitive decision between the parties. Whether the decision is denominated a judgment, an order, an award, a decree, or a sentence, is very immaterial. They would all be but different names for the same thing, and, perhaps, any of them may be applied to this decision without violence. By whatever terms these proceedings may be described, they were, in substance and essence a suit by one party to recover the possession of lands from another. By whatever name the decision may be called, it is, in effect, a final judgment by which the suit is terminated, and the subject in controversy is awarded to one party against the other. The party who has been adjudged to lose his possession, may be aggrieved by this determination, and as it is the final determination of a cause in the supreme court, he has a constitutional right to bring the cause to this court for a final decision.

It is said that this is not a record. I believe it to be true that no record like this can be found in the books of the common law. But if a record be a history of the proceedings in a cause, then this is a record. It is the only record that can be made where proceedings like these take place. The constitutional right of the party to his appeal does not depend upon any *English* definition of a record. It depends upon the fact that his cause has been determined against him.

This question is, therefore, not to be determined by technical definitions and verbal criticism, or by the terms and phrases in

IN ERROR.
.....
ALBANY,
April, 1814.

CLASON
v.
SHOTWELL.

which judgments have been, or may be, expressed. The true inquiry is, whether the judicial proceeding constitutes a cause by itself, and has received its final decision in the supreme court. If so, the case contemplated by the constitution exists, and the cause may be brought to this court for revision.

It is truly said, that the proceedings of the supreme court in this case were summary. This cannot affect the right of appeal. Whether the proceedings were summary or plenary, that right equally exists. If the proceedings be an action, or have the effect of an action, the appeal must be allowed. Whatever may be the mode of proceeding adopted by the supreme court, whether formal and usual, or extraordinary and summary, it can make no determination of the cause which will not be subject to the constitutional revision of this court. Whether the mode of proceeding has the sanction of antiquity, or is altogether new, the right of appeal exists in the party, and the appellate jurisdiction exists in this court. If the mode of proceeding, adopted by the supreme court, be summary, or illegal, that mode of proceeding may be the very grievance of which the party condemned has to complain. All causes determined in the supreme court, whatever may be the course or mode of proceeding by which they may be conducted or determined, are subject to the appellate jurisdiction of this court.

It is also said, that if this appeal be allowed, this court may be drawn into the trial of facts. The answer to this objection will be found in the principles already stated. If the supreme court entertain a cause in which they try and determine facts, it does not follow that their decision is final. The right of appeal still exists, and it is made the duty of this court to hear and decide the cause upon an appeal. If the supreme court should try an issue of fact, without a jury, in an action of trespass or debt, it would be the duty of this court to entertain the cause upon an appeal, and either to decide that such a mode of trying the fact is illegal, or if it be legal, then to try the fact upon the same evidence on which the supreme court judged and decided.

It is said that the supreme court has a superintending authority, over all the courts of law inferior to itself. This is true, and it ought to be so. The superintending authority, as it is called, is, in other words, an appellate jurisdiction, over all inferior jurisdictions. It is exerted when a party, aggrieved

IN ERROR.
.....
ALBANY,
April, 1814.

CLASON
v.
SHOTWELL.

by a determination, or some proceeding of the inferior court, complains to the supreme court, and brings the cause before them for their decision. By whatever form or mode of proceeding this is done, it is, in substance and effect, an appeal from one court to the other. The supreme court has no original jurisdiction in cases of forcible entries or detainers. The original jurisdiction in those cases is vested in the justices of the peace; but their proceedings may be removed to the supreme court. In this case the supreme court held, that no accident could deprive them of their superintending authority, or appellate jurisdiction. An accident, like the death of the justice, might defeat the ordinary modes of proceeding, or render them ineffectual; but the party aggrieved was not, for that reason, to lose the redress which the supreme court might give him, upon an appeal to them. Their appellate jurisdiction must be exercised, because the exercise of it was required from them by the party. They therefore held, that if the writ of *certiorari* would not bring the cause to them, the cause must come in some other way. I do not now inquire whether they adopted a legal or proper mode of proceeding. They also held, that whether the judicial proceedings of the justice were recorded or not, they must still exert their superintending or appellate authority. Whether there was a technical record, or a technical judgment, before the justice, or not, were questions which the supreme court thought had no concern with the right of the party to his appeal, or their right to entertain the appeal, and revise the cause. When they speak of their own interference upon affidavits, they say it is a matter of necessity. If it was a matter of necessity, it was so because the right of appeal from the justice to the supreme court could not be frustrated by any cause whatever. The supreme court, indeed, appear to have held, that nothing whatever could prevent the right of appeal, or the exercise of their own appellate authority. In all this, the supreme court took a just view of the nature of appellate jurisdiction; and they rightly concluded, that any particular or extraordinary mode of proceeding in the inferior court, could not deprive the superior court of its appellate jurisdiction.

If these views of the question between the justice's court and the supreme court were correct, they are fully applicable to the question between the supreme court and this court. The appellate jurisdiction of this court is as ample as the appellate jurisdiction, or superintending authority of the supreme court over the inferior courts. If necessity will authorize a summary mode of proceeding, in the supreme court, to enable them to exercise their jurisdiction, it must be a strange necessity, if it should, at the same time, make that jurisdiction final. It would be a necessity that there should be one appeal, and no more than one. It would be, at once, a necessity to give jurisdiction to the supreme court, and a necessity to take away jurisdiction from this court. The constitution ordains that there shall be no such necessity in this state. If it be necessary that the supreme court should exercise its jurisdiction over such proceedings, and in this manner, the necessary consequence is, that this court must exercise its jurisdiction in the same case. I say the necessary consequence, because the necessity or obligation to entertain the cause in this court is of the highest kind; since it is derived from the supreme law, the constitution itself.

It will be understood that I have, throughout, used the word appeal, in the general sense of the term. The technical distinctions between the different modes of appeal, whether by writ of error, writ of *certiorari,* or otherwise, are foreign to the purpose of the present inquiry.

I am clearly of opinion, that this court has jurisdiction in this case, and that the cause is now properly before this court for its determination.

The judgment of the justice seems to have been a conviction of *Briggs,* and nothing more. The strict duty of the supreme court was to reverse or affirm the judgment of the justice. If they reversed or quashed the judgment or conviction of the justice, it was not a necessary consequence that the possession should be restored. The party prosecuting before the supreme court could not demand restitution as his right. The court might grant it or not, as a matter of discretion. The title is not here in question. The object of the law, in such cases, is to protect persons who are in quiet possession, from violence. It appears that there had been some struggle between these parties, in which they wrested, or attempted to wrest, the pos-

session from each other, at different times. In deciding which of them shall have the possession, it seems proper, in such circumstances, to look back to the commencement of the contest, and to give preference to the party who had the first peaceable possession. The first quiet possession was in *Clason*, and his tenants; and it appears that *Shotwell's* possession was gained surreptitiously.

As it does not appear that the possession was changed by any judicial proceeding of the justice; as the first peaceable possession was in *Clason*; and as the case is, in many respects, involved in obscurity and contradiction, I am of opinion that the possession should not have been adjudged to *Shotwell*. To award the possession of land from one party to another, is a sentence highly important to both. The advantage of possession to either party may be great. It is redress which, I think, ought not to have been given to *Shotwell*, as an act of discretion.

Entertaining this opinion upon the merits of the case, I do not find it necessary to consider or express an opinion whether the mode adopted by the supreme court, in hearing and deciding the cause, upon the affidavits of the parties and their witnesses, was proper or not.

My voice will accordingly be, that the judgment of the supreme court, awarding the possession to *Shotwell*, ought to be reversed.

ELMENDORF, BLOODGOOD, and VAN BUREN, concurred with LEWIS and SANFORD, Senators, that a writ of error lies in this case, and that the judgment of the supreme court ought to be reversed.

COCHRAN, WENDELL, and STEWART, Senators, were of opinion that the writ of error ought to be quashed; and that, if it would lie, they were of opinion that the judgment of the supreme court ought to be affirmed.

BISHOP, BLOOM, CLARKE, DAYTON, ROUSE, SMITH, STRANAHAN, SWIFT, TABOR, and VAN BRYCK, Senators,* were of opinion that the writ of error was well brought, and that the judgment of the supreme court ought to be reversed.

* For reversing,
17. For affirming, 5.

IN ERROR.
•••••
ALBANY,
April, 1814.

* April 7, 1814.

It was thereupon ORDERED and ADJUDGED,* that as well the judgment of the supreme court in this matter, as the award of re-restitution thereupon made, be reversed, annulled, &c.; and that *Isaac Clason* be restored to the possession of the premises whereof re-restitution was awarded as aforesaid, and to all things he hath lost by occasion of the judgment aforesaid, and the said award thereupon made; and further, that the said *Isaac Clason* recover against the said *Gilbert Shotwell,* as well his costs and charges by him sustained and expended in and about his defence in the said supreme court, as his costs and charges by reason of the prosecution of the writ of error in this court, to be taxed by the clerk of this court; and that the record be remitted, &c.

